## Commonwealth vs. Bruce E. Frank.

Bristol. December 5, 2000. - January 12, 2001.

Present: Marshall, C.J., Greaney, Spina, Cowin, & Sosman, JJ.

*Practice, Criminal,* Assistance of counsel, Capital case, Argument by counsel, Argument by prosecutor. *Constitutional Law,* Assistance of counsel. *Intoxication. Evidence,* Expert opinion.

At the trial of a first degree murder case in which the defendant's principal defense was intoxication, defense counsel was not shown to have provided ineffective assistance to the defendant in making an informed and reasonable tactical decision not to call a medical expert witness to testify about chronic alcoholism and to rely solely on the testimony of the defendant. [190-192]

At a murder trial in which intoxication was the principal defense, the judge should have admitted the defendant's testimony regarding prior episodes of blackouts when he had been drinking, and defense counsel should have made an offer of proof concerning the defendant's proposed testimony and called witnesses to corroborate the defendant's having experienced blackouts; the errors did not, however, provide a basis for granting a new trial, where nothing in the evidence concerning blackouts would have made a difference in the outcome. [192-194]

At the trial of a murder indictment, the jury's questions during deliberation demonstrated that they understood the defense of intoxication and were not misled by any misstatement of defense counsel in closing argument [194]; and the defendant's challenges on appeal to other remarks by his trial counsel were without merit [194-195].

Remarks of the prosecutor in closing argument at the trial of a murder indictment were based on the evidence and fair inferences therefrom and did not, in any event, create a substantial likelihood of a miscarriage of justice. [195-196]

Indictments found and returned in the Superior Court Department on October 8, 1987.

The cases were tried before *Elizabeth J. Dolan,* J., and an amended motion for a new trial, filed on August 25, 1998, was heard by her.

*J. W. Carney, Jr. (Andrew M. D'Angelo* with him) for the defendant.

*Catherine B.S. Ledwidge,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of kidnapping and murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel, he has appealed from the judgments of conviction and from the order denying his motion for a new trial. His principal argument on appeal is that his trial counsel furnished him with constitutionally inadequate representation by (1) failing to present expert medical testimony that the defendant's intoxication on the night of the killing would have rendered him incapable of forming the specific intent or engaging in the deliberate premeditation necessary to commit murder in the first degree; (2) allowing the prosecution to exploit, in an unfair manner, the absence of evidence on the defendant's claimed memory loss on the night of the murder; and (3) giving a closing argument that undermined the defendant's intoxication defense and was ineffective in other respects. The defendant also argues that portions of the prosecutor's closing argument were so improper that he was denied his right to a fair trial. We conclude that there is no basis to order a new trial. We also conclude that the defendant is not entitled to relief under G. L. c. 278, § 33E. Accordingly, we affirm the defendant's convictions.

Based on the evidence in the Commonwealth's case, the jury could have found the following facts. In the early morning hours of October 2, 1987, after an evening of drinking with his sister and friends at various bars and apartments, the defendant joined his sister, and her male companion, for a ride home. The defendant's sister first drove to the apartment of her companion. When the defendant's sister and her companion began kissing in the apartment, the defendant departed and started walking home. On his way, at an intersection near his apartment, the defendant met three friends, Kevin Costa, Steven Costa, and Michael Costa. The men were standing around Steven's automobile. The victim, Edward Cereto, was lying on the ground nearby. The victim was known to the defendant, who had recently cleaned out a storage area under the porch of his apartment building at the request of his landlord, so that the victim, previously homeless, could live there. One of the four men put the victim into the trunk of the automobile. The men then drove to the defendant's apartment, where he obtained his shotgun and several shotgun shells. The men drove to Freetown State Forest, where one of the men forcibly removed the victim from

the trunk of the automobile. At least one of the men started hitting the victim. Someone told the defendant to shoot the victim, so the defendant retrieved his shotgun from the automobile and shot the victim. The defendant then handed the shotgun to one of the other men. The other men took turns shooting the victim. The men then attempted to leave the forest, but first got lost, and ended up driving past the victim before finding a way out. After dropping off Michael and Kevin at their residence, the defendant and Steven returned to the defendant's apartment.

The victim, whose body was discovered later that morning, died of multiple shotgun wounds, three to his head (which were fired at close range), two to his chest, and one to his groin. The victim also suffered burns covering part of his chest and extending to his neck, and burns on his right leg. A book of matches was recovered near the victim's body by the police. Two days after the victim's body was found, the defendant was questioned by police. Among other information, the defendant told them that he did not own any kind of weapon. He then hid the shotgun underneath a wood pile in a yard near his apartment. Later that day, the defendant informed police that he did own a weapon, and took police to the wood pile where they seized the shotgun. That evening, the defendant confessed to the killing in some detail, and gave a written statement to the police concerning his involvement.[1]

Steven and Kevin Costa were convicted in separate trials of murder in the first degree, and we affirmed these convictions, see *Commonwealth* v. *Costa*, 414 Mass. 618 (1993), and *Commonwealth* v. *Costa*, 407 Mass. 216 (1990), respectively. Michael Costa pleaded guilty to murder in the second degree. *Commonwealth* v. *Costa*, *supra* at 624 n.4.

1. We first take up the defendant's claims that his trial counsel furnished him with constitutionally ineffective representation. Because the defendant has been convicted of murder, we examine these claims to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than is the general constitutional standard for determining ineffective assistance of counsel. See *Commonwealth* v. *Coonan*, 428 Mass. 823, 826-827 (1999). We therefore consider "whether there was an error in the course of

---

[1]On appeal, the defendant does not challenge the trial judge's finding that he voluntarily made these statements to the police.

the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

(a) The defendant's principal defense at trial was intoxication. This defense was presented by two witnesses and by the defendant. One witness, the defendant's sister, testified that she spent most of the evening of October 1, 1987, at a bar drinking with the defendant, who drank "at least seven or eight beers and a few shots of [bourbon]." She also stated that the defendant, at one point during the evening, informed her that he was going into the bathroom to "do some" cocaine, and that, later in the evening, the defendant swallowed a "green pill" and smoked marijuana. She described her brother as "very drunk" when he left her that night. Another witness, a friend of the defendant's sister, testified that, when she last spoke with the defendant at about 1:45 A.M. on the morning of the killing, he was swaying from side to side, and appeared to be "really drunk."

The defendant, who was twenty-one years old at the time of trial, testified that he began drinking at the age of eleven or twelve years. By the time he was fourteen years old, he became drunk whenever he drank. He stated that, as a result of two arrests for driving while under the influence of alcohol, he once spent two weeks in a hospital undergoing treatment for alcohol abuse. On his release, however, the defendant testified that he continued to experience problems with alcohol. The defendant's description of his activities during the evening prior to the killing included a significant level of alcohol consumption.[2] He also testified that he ingested two "lines" of cocaine that evening.

The defendant testified that he had no recollection of certain details that night, such as who put the victim in the trunk of the automobile, and could not recall going into his apartment to retrieve his shotgun. Although the defendant testified that he remembered firing his shotgun at the victim, he could not recall anyone else shooting the victim, and he had no memory of get-

---

[2]According to the defendant's testimony, he drank one beer at a bar around 5:30 P.M.; a second beer and a "shot" while waiting for his sister; six or seven more beers, with "shots," after his sister arrived at the bar; several more beers and one "nip bottle" of bourbon at the home of his cousin; and, later, a beer and another shot of bourbon at another bar.

ting back to his apartment. The defendant stated that later that morning, he woke up in his bed and "wasn't sure what had happened."

In his amended motion for a new trial, filed ten years after the trial, the defendant asserted that his only viable defense at trial was based on his intoxication, which he claimed negated specific intent and premeditation and his ability to share the intent of the other participants in the crimes. The trial judge conducted an evidentiary hearing on the motion.

At the hearing, Dr. Harold Rosenblatt, a physician specializing in internal medicine and addiction medicine, testified on behalf of the defendant. After reviewing the trial transcript and the defendant's alcoholic history (as related by the defendant), as well as meeting twice with the defendant, and conducting interviews with family members and a friend, Dr. Rosenblatt concluded that it would have been impossible for the defendant to form a specific intent or to premeditate with the amount of alcohol and drugs that he had in his bloodstream at the time of the killing. Dr. Rosenblatt based this conclusion on his determination that, for at least seven years, the defendant had been drinking extremely heavily, to the point where he regularly experienced blackouts, and "so by definition he's really an end stage alcoholic." Dr. Rosenblatt's testimony essentially was that the amount of alcohol and drugs that the defendant had consumed during the night before the killing would have affected his brain function and made it "extremely difficult for him to concentrate or focus, even for some perceptible period of time." Dr. Rosenblatt testified that it is common for severe alcoholics to sustain blackouts, and he opined that the defendant's selective memory loss concerning events leading up to the killing, and his history of similar lapses of memory, indicated that his heavy drinking had impaired his brain function.

The defendant's trial counsel also testified at the motion hearing. He stated that, although he had considered the use of an expert to support the defendant's intoxication defense, he decided against doing so, because of his concerns over potentially damaging cross-examination of such an expert. He indicated that he feared that the prosecutor would confront an expert with admissions made by the defendant to the police, and with testimony of other witnesses regarding the defendant's statements in the hours before the killing that would cast doubt

on the expert's opinion that the defendant was incapable of specific intent or the ability to premeditate, and make the expert "look like a hired gun." The defendant's trial counsel further explained that his trial strategy was for the defendant, whom he considered to be a likeable and believable individual, to "tell his story as best he could and explain to the jury the effect that the alcohol had on him on that particular evening." He testified to discussing this strategy with the defendant, but had not discussed with him whether to consult an expert.

The judge ruled that trial counsel's decision not to use a medical expert witness did not constitute ineffective assistance of counsel. Acknowledging that the use of expert testimony might have bolstered the defendant's claim of memory loss, the judge concluded that "[h]indsight evaluation that the assistance of an expert might have enhanced the defendant's credibility does not translate" a tactical decision by trial counsel into ineffective assistance of counsel.

The defendant argues that medical expert testimony was necessary to educate the jury about the physical impact of chronic alcohol abuse on the human brain, particularly because the defendant testified to drinking such a large quantity of alcohol before he met the Costas. The defendant asserts that the success of his defense depended on the jury's understanding that an alcoholic can consume an immense quantity of alcohol and still perform fairly automatic physical functions, yet, at the same time, be unable to "think clearly, to plan or to sequence." In addition, according to the defendant, a medical expert was needed to explain to the jury that memory failures are typical of chronic alcoholics, and that the defendant's assertion of memory gaps from that night was entirely consistent with his history of regular blackouts. Without such testimony, the defendant argues, his statement at trial that he could remember just "bits and pieces" from the night of the murder could be ridiculed by the prosecutor in cross-examination and closing argument. The defendant concludes that his trial counsel's failure to present an expert in support of his intoxication defense rose to the level of constitutionally ineffective assistance of counsel and was likely to have unfairly influenced the jury's verdicts. We disagree.

"An attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made." *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998).

The defendant's trial counsel testified that, although he considered the use of a medical expert to support the intoxication defense, he decided against it based on his knowledge that any such expert would be subjected to potentially damaging cross-examination. The evidence concerning the defendant's behavior, as admitted by him to police, in many respects undercut the defendant's claim that he was so intoxicated that he was incapable of forming a specific intent to kill or to premeditate.[3] In addition, in formulating his strategy, counsel was aware of the possibility that Michael Costa might testify for the Commonwealth, and counsel considered statements attributed to the defendant that were contained in police reports pertaining to the three codefendants.

The defendant's trial counsel determined that the defendant's best chance to win the jury's sympathy (undoubtedly to seek a lesser degree of guilt than murder in the first degree) was to forgo a medical expert entirely, and to rely instead on the defendant's innate ability to present his story in an honest and straightforward manner. Counsel had experience in the trial of criminal and murder cases in the Superior Court, he had used experts in the past, and he had found them, according to his testimony, at times "helpful," and, at other times, subject to "cross-examination [that] . . . do[es] . . . damage" and that tends to undo their "particular[] help . . . on direct examination."[4] He advanced his assertion of the defendant's intoxication defense by introducing testimony from the defendant, and

---

[3]For example, the defendant had had the foresight to find his shotgun and ammunition used to shoot the victim after the victim was taken to a remote location. Also, only two days after the killing, the defendant was able to lie to police about his activities on the morning of, and involvement with, the killing, and about whether he owned a shotgun, and was able to then retrieve and hide his shotgun. Further, later that day, the defendant was able to lead police to the shotgun's location, and recount to them many of the details preceding and including his involvement in the killing. See *Commonwealth* v. *Parker*, 420 Mass. 242, 248 (1995) (nature and means of murder, attempt to conceal murder, and ability to provide police with detailed account of events leading up to murder are inconsistent with intoxication defense); *Commonwealth* v. *Burke*, 414 Mass. 252, 264 (1993), quoting *Commonwealth* v. *Mercado*, 383 Mass. 520, 528 (1981) ("basic trouble . . . was weakness in the facts rather than any inadequacy of counsel").

[4]Dr. Rosenblatt was subjected to extensive cross-examination by the prosecutor at the hearing on the motion for a new trial. Although this cross-examination did not track potential trial cross-examination, it did weaken Dr. Rosenblatt's opinions, and cause the defendant's trial counsel to testify that

two other witnesses, regarding the defendant's state of intoxication. Counsel then argued the issue forcefully to the jury. He also requested a jury instruction that evidence of voluntary intoxication can negate the knowledge and intent elements of the crimes, and this instruction was properly given. See *Commonwealth* v. *Mello*, 420 Mass. 375, 394 (1995); *Commonwealth* v. *Henson*, 394 Mass. 584, 593-594 (1985).

It is true, as the defendant points out, that evidence that a defendant's mind may have been impaired at the time of the crime by intoxication "almost always includes expert testimony" that relates to the issues of intent and the ability to premeditate. *Commonwealth* v. *Cruz*, 413 Mass. 686, 690-691 (1992), and cases cited. As our cases illustrate, however, the fact that such expert evidence is often presented does not make a decision by a defendant's trial counsel not to provide such evidence a per se case of ineffective representation.[5] The critical inquiry is whether counsel's choice was an informed and reasonable decision, a consideration to be assessed in light of his over-all representation of the defendant at the trial. If so, the decision was not error, and, therefore, by definition, not a matter "likely to have unfairly influenced the jury's verdict." *Commonwealth* v. *Plant*, 417 Mass. 704, 715 (1994). Based on the considerations set forth above, the decision by the defendant's trial counsel was, as found by the trial judge who was familiar with the trial, a reasonable tactical choice. It cannot be said that the defendant was afforded representation so lacking in skill and planning that it would be repugnant to constitutional values to allow his murder conviction to stand.[6]

(b) At trial, the defendant's trial counsel attempted to elicit

_____

the cross-examination represented the type of problem he sought to avoid at the trial.

[5]For cases where trial counsel's decision, in a capital case, not to introduce expert testimony was found not to constitute ineffective assistance of counsel see, e.g., *Commonwealth* v. *Cormier*, 427 Mass. 446, 450-451 (1998) (failure to present expert on effects of intoxication); *Commonwealth* v. *Hardy*, 426 Mass. 725, 730-731 (1998) (failure to introduce expert on mental impairment); *Commonwealth* v. *Bousquet*, 407 Mass. 854, 863-864 (1990) (failure to call expert on effects of hashish).

[6]The two cases on which the defendant relies, *Commonwealth* v. *Hill*, 432 Mass. 704 (2000), and *Commonwealth* v. *Cruz*, 413 Mass. 686 (1992), are distinguishable. Our recent decision in *Commonwealth* v. *Hill*, *supra*, is not on point. See *id.* at 718-719 (in light of absence of any credible explanation, defense counsel's failure to call potentially key eyewitness [not an expert], although there existed possibility of aggressive cross-examination, was

testimony from the defendant on prior episodes of blackouts when he had been drinking. The judge sustained the prosecutor's objection to this testimony. The defendant's trial counsel did not make an offer of proof concerning the defendant's proposed testimony, nor did he call witnesses, as promised in his opening statement, to corroborate the defendant's claim that he previously had experienced blackouts. The defendant now makes three distinct assertions on the matter. He first argues that the judge erred in excluding the evidence. The defendant then argues that the failure of his trial counsel to make an offer of proof summarizing the defendant's anticipated testimony constituted ineffective assistance that allowed the prosecutor, in cross-examination of the defendant and in closing argument, to exploit unfairly the defendant's testimony about his memory loss on the night of the murder. Last, the defendant argues that his trial counsel should have called witnesses to corroborate the defendant's claim of having previously experienced blackouts.

The judge should have admitted the testimony. The defendant was entitled to show, consistent with his claim that he was a chronic alcoholic, that he had suffered blackouts in the past after drinking excessively. This testimony would have supported, in some respect, his assertion that he could not remember many of the details pertaining to the killing. Trial counsel for the defendant also should have preserved the point by making an appropriate offer of proof.

We conclude, however, that the errors do not constitute a basis to order a new trial. The jury heard considerable testimony about the defendant's serious, and longstanding, drinking problem. They had before them the defendant's testimony about his lack of memory at the time of the murder, and they undoubtedly could infer (from the defendant's testimony and their common experience) that he may have suffered blackouts in the past. We do not consider the prosecutor's cross-examination of the defendant as to his loss of memory on the night of the

"manifestly unreasonable"). We held in *Commonwealth* v. *Cruz, supra* at 689-691, that the opinion of an expert witness, that a defendant's mind may have been impaired at the time of a crime due to intoxication, should not have been excluded by the trial judge. Although we recognized that a jury might not necessarily know, apart from the excluded testimony, what effect a high blood alcohol level might have had on the defendant's mental processes, we did not hold that such expert testimony is required, or that defense counsel's failure to introduce such expert testimony would rise to the level of constitutionally ineffective representation. See *id.* at 691.

murder, and what was said about that evidence by the prosecutor in his closing, as inappropriate or unfair. See *Commonwealth v. Beauchamp,* 424 Mass. 682, 691 (1997) (prosecutor may impugn defendant's credibility and argue that his story is fabricated); *Commonwealth v. Lamrini,* 392 Mass. 427, 431 (1984) (prosecutor may, during closing argument, suggest to jury what conclusions jury should draw from evidence, including that defendant had fabricated defense). The matter was put in issue by the defendant's admission to the police, the cross-examination by the defendant's trial counsel of the State trooper who interviewed the defendant, and the defendant's own testimony. There is nothing in this aspect of the trial that would lead us to conclude that evidence concerning the defendant's alleged prior blackouts would have made a difference in the outcome.

2. We reject the defendant's present contentions that the closing argument made by his trial counsel was "a paradigm for an ineffective closing argument."

(a) The statement by the defendant's trial counsel in his summation that "[w]e aren't going to attempt to prove that [the defendant] was so intoxicated that night that he could not form [the] requisite intent to premeditate murder" may have been, as noted by the judge, something said "through inadvertence" or something "transcribed incorrectly." The statement did not undermine the defendant's intoxication defense. Throughout his closing argument, the defendant's trial counsel repeatedly stressed to the jury that the key issue was that the defendant, because of his intoxication, could not form specific intent or premeditate. Defense counsel also advised the jury as to the judge's instructions on the effect of a finding of intoxication on the defendant's ability to possess the mens rea elements of murder. The jury's questions during deliberations about the issue of intoxication show that they understood the nature of the defense, and that they were not confused by the statement of the defendant's trial counsel quoted above.

(b) The defendant also criticizes remarks by his trial counsel, in closing argument, concerning whether the victim had been killed before he was placed into the trunk of the automobile. The defendant claims this argument was "pitiful" because it ignored the undisputed testimony of the medical examiner that the victim died of multiple gunshot wounds. The remarks, however, had support in the evidence. There was no evidence

that the victim moved, groaned, or spoke from the time the defendant met the Costas, or thereafter, and the medical examiner testified that a gunshot blast to the head could mask a previously inflicted skull fracture. By these remarks, defense counsel permissibly, and subtly, suggested to the jury that the defendant's shooting of the victim may not have been murder because the victim was already dead.

(c) Last, there is no merit to the defendant's claim that a remark by his trial counsel, "And I would suggest to you, again, you have to decide when [the defendant] got involved. No question at some point he did, and he's not saying that he didn't," amounted to a concession that the defendant had participated in a joint venture murder. When read in context, the remark served only to caution the jurors that they had to decide when the defendant became involved in the venture. This interpretation is consistent with the evidence and defense counsel's argument that the defendant had not been involved in the victim's kidnapping, and may not have been involved in his murder, because the victim may have been dead before being placed into the trunk of the automobile.

(d) The defendant's challenges to remarks by his trial counsel concerning "consciousness of guilt" evidence are lacking in merit. These remarks were made in an attempt to downplay the defendant's initial lies to the police and were consistent with consciousness of guilt instructions suggested in *Commonwealth* v. *Toney*, 385 Mass. 575, 585-586 & n.6 (1982).

In sum, the closing argument given by the defendant's trial counsel adequately presented the defense of intoxication in the face of a strong prosecution case.

3. The defendant argues that numerous comments made by the prosecutor in his closing argument were improper, and effectively denied him a fair trial. The remarks now criticized were not the subject of an objection. We therefore examine whether anything said by the prosecutor was improper and, if so, whether the impropriety created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Luce*, 399 Mass. 479, 483 (1987), and cases cited; *Commonwealth* v. *Haas*, 398 Mass. 806, 812 (1986). In making this analysis, it is important to note that this case was tried in 1988. The prosecutor had the benefit of the decision in *Commonwealth* v. *Kozec*, 399 Mass. 514 (1987), in which we set forth the obligations of prosecutors with respect to proper and fair closing argument. However, the

prosecutor did not have the benefit of the many cases decided by this court, and the Appeals Court, since 1988, in which the general principles discussed in the *Kozec* decision have been applied to specific arguments made by prosecutors that were claimed to be improper.

We need not address each of the criticized remarks. We conclude that the prosecutor's argument, for the most part, was based on the evidence and fair inferences from the evidence. See *Commonwealth* v. *Kozec, supra* at 516. As was said about the complaints of the prosecutor's closing remarks in the opinion upholding the convictions of the codefendant Steven A. Costa, "[t]he passages [complained of] amount to little more than enthusiastic rhetoric, strong advocacy, and excusable hyperbole." *Commonwealth* v. *Costa*, 414 Mass. 618, 629 (1993). On one or two occasions the prosecutor may have gone over the line with an improper appeal to the jury's sympathy. The judge's instructions clearly informed the jury that the closing arguments of counsel are not evidence,[7] and because the jury are to be given a measure of sophistication in sorting out excessive claims made in closing argument, we conclude that any missteps made by the prosecutor did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Kozec, supra* at 517; *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984).

4. We have reviewed the record pursuant to our duty under

---

[7]The judge advised the jury as follows: "We will . . . enter into the closing arguments by counsel in the case. Closing arguments do not constitute evidence in the case. You've heard the evidence in the case through the testimony of the witnesses and the exhibits that have been entered, and you will have those available with you in the jury deliberation room.

"This will be the last opportunity that both counsel will have to address the jury. We say closing arguments do not constitute evidence because [they are] the statements of lawyers. And they are advocates and it is their job and their duty to argue to you as jurors the effect of the evidence in the light most favorable to their respective positions. And you are cautioned now, before closing arguments begin, that if through inadvertence, and counsel, either one, enters into a reference to any fact that you do not recall having come into evidence through the testimony of the witnesses, or to be examined or viewed by exhibit, you would be bound to disregard that fact. For it will be the memory of the twelve jurors who go into that jury deliberation room that controls and not the memory of the attorneys, nor indeed the memory of the judge, for you indeed are the sole triers of the facts in the case. But I said this is the last opportunity that they have to sum up and argue the effect of the evidence."

G. L. c. 278, § 33E. The verdict of murder in the first degree is not against the law or the weight of the evidence, and the verdict deserves to stand.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*